SOUTHWESTERN TRANSPORTATION COMPANY *v.* CHAMBLISS.

4-5342                                   125 S. W. 2d 123

Opinion delivered February 20, 1939.

*A. H. Kiskaddon, C. S. Hadley, Gaughan, Sifford, Godwin & Gaughan,* for appellant.

*D. A. Jackson* and *J. H. Lookadoo,* for appellee.

GRIFFIN SMITH, C. J. This appeal questions sufficiency of the evidence to sustain personal injury verdicts and judgments, one for $2,500 in favor of L. D. Chambliss; the other for $1,000 in favor of Glea Chambliss.

L. D. Chambliss claimed that while driving his automobile south on highway 67, he was injured a few miles north of Gurdon when a stick of wood fell from a Southwestern Transportation Company truck. The circum-

stances alleged were these: While appellee and the driver of a wagon were passing, going in opposite directions, appellant's truck, driven in a "dangerous, reckless, careless and negligent manner, and at a high rate of speed," passed the wagon, and after so passing, the truck wheels were "carelessly and negligently cut back to the right side of the highway." This action caused a stick of wood to fall and be hurled through the windshield of appellee's car, resulting in cuts on appellee's face from flying glass, and injury to the left eye.

Glea Chambliss, daughter of L. D. Chambliss, alleged that her injuries occurred when muscles and ligaments were torn loose from her hip bone and from the lumbar region of her spine; that she suffered contusions of her hip on the right side, and her nerves were completely upset. She said that when the stick came through the windshield, "I tried to get out of the way, and it caused me to hurt my back."

The causes were consolidated for trial.

It was admitted that appellant's bus traveled from Camden to Texarkana to Arkadelphia the morning of January 4, 1938, which was the day of the accident.

Alvin Francis, a witness for appellees, testified he was using a wagon in hauling wood and was near the drainage ditch "when the Southwestern truck passed me and moved on out of sight. The truck was traveling rapidly, and as soon as it passed, it came back on its side of the road. I didn't see anything happen right then. He knocked me off from seeing the car as he cut out to the side. [Appellees'] car was stopped with the windshield broken. I drove up to where the car was stopped. . . . It was a Southwestern Transportation Company truck that passed me. . . . The old gentleman got out of his car and walked over to where I was. There was glass on his shoulder and on his clothes, and blood was oozing out of his face. His daughter was sitting in the car. After they had stopped for a few minutes they drove on to Gurdon. The old man asked me about the truck and I told him what truck it was."

On cross-examination the witness was shown a statement he had given C. T. Kelliher. Francis admitted his

signature and said, "I told the truth about it.[1] The biggest part is correct, but part is not. . . . The part where you stated that I saw the car stop before the truck passed me. I never testified that at all."

Following introduction and discussion of the statement, Francis insisted he told Mr. Chambliss the name of the truck; that it had "Southwestern" on it. When asked what else was on the truck, he replied, "Southwestern Transportation." Asked if he was sure as to the words "Southwestern Transportation," he replied: "It had Southwestern Transfer Company [on it]." Later, he said: "It had Cotton Belt on it."

"Q. Why didn't you tell Mr. Chambliss that? A. He knew what I was talking about—he didn't ask me any further details and I didn't volunteer [any]." He said the truck did not have a tarpaulin on it and that he did not remember seeing any truck with a tarpaulin on it pass, but did remember seeing a brick truck, which passed him "right at the Chevrolet."

L. D. Chambliss testified: "Just as we crossed the [Terre Noire Canal] bridge this big truck came along and a stick of wood came off the top of it and went through our windshield. My eyes were so filled with glass I couldn't see anything. I couldn't tell what kind of a truck it was. . . . After the truck passed a wagon, the stick of wood came from somewhere—it looked to me

---

[1] The statement made by Francis was: "I was just driving along about the rate a team can travel. . . . There is a bridge over the canal and before I got to this bridge a big truck went around me, and I glanced around at it, and saw 'Southwestern' on the side of the trailer. The truck went on and I did not pay so much attention. . . . But I drove about 100 yards and before I got this distance I noticed an auto off to the side of the highway; it had stopped. However, before the truck passed me I had looked up that way and did not see any auto out there. . . . I drove to the auto and stopped my team. I noticed the windshield of this auto broken out mostly all on the right side. The man got out of the car before I got to him. . . . I saw some blood on his face and shattered glass on his coat. About the time I got stopped there was a truck loaded with brick came up behind me, and pulled around in front of my team. Then the driver of the brick truck got out and talked to this man in the auto. I heard him ask this man what big truck that was passed him down the road and he told him it was a Southwestern

like off the top of the truck. I was about sixty feet from the wagon when the truck went around it."[2]

On cross-examination the witness said the accident happened between ten and eleven o'clock [in the morning], about four or five miles from Gurdon and eleven or twelve miles from Arkadelphia. Witness and his daughter drove to the Norris garage at Gurdon. "I knew Mr. Ross at the garage and he called Arkadelphia for me. I told [Mr. Ross] it was a Southwestern Transportation Company truck. Some one asked if there was a tarpaulin on the truck and I told them if there was I didn't know it. I don't know whether or not I told him there was a tarpaulin and a stick of wood was holding the tarpaulin down and it fell off. I would not say that I didn't tell Mr. Ross the kind of truck it was. I couldn't say what information my daughter may have given Mr. Ross. . . . I didn't know, neither did my daughter, whose truck it was."

Glea Chambliss testified that while driving back from Arkadelphia she saw a wagon "coming meeting us"; that

truck. He also asked me what truck passed me just ahead of him, and I told him I saw 'Southwestern' on the side of it. I imagine the truck passed me making around 25 or 30 miles per hour. I never saw anything fall from this truck. . . . All I know is that I saw the Southwestern truck pass me, and then saw this auto on the side of the road with its windshield broken out. . . . I come up on the highway about a mile south of scene of accident or where the Southwestern passed me. . . . All I know is what they said and I know the truck passed around me. I imagine it was at least 100 yards between where truck passed me and where I saw the auto on the side of the road, and as I stated, I figure the auto had just pulled over on the side of the road and stopped, when I noticed it. This old man in the auto said he saw the truck pull around me down the road. The highway is straight along here and on a dump, rather high, which goes through the bottom. I only stayed there but a couple of minutes. The driver of the brick truck went ahead of me."

[2] Mr. Chambliss described his injury in the following manner: "The damage that was done to me was from the flying glass as the stick came through the windshield. It also cut my face and filled my left eye full of pulverized glass. My right eye, prior to that time, and for several years, had been bad. I have not been able to read much since the accident. I don't believe my eye is getting any better but believe it is getting worse. I had considerable pain from the injury; even now it hurts. I had to wear a blind over it for a month and a half. I wear the blind because the light hurts my eye."

she saw a truck coming in the same direction the wagon was moving, and it had to "whip around" the wagon in passing. "About the time the truck got even with our car a stick of wood flew from the top of the truck and went through the windshield of our car. The truck was going as fast as it could, making 50 or 60 miles an hour. . . . I saw the truck as it passed the wagon and I began to slow down because I knew there would be a collision if we both went full speed. The truck was just getting back on its side of the road when the stick flew off. . . . The stick was about two and a half or three feet long. . . . When it came through the windshield I tried to get out of the way and it caused me to hurt my back."

On cross-examination the witness stated that after the accident she drove to Gurdon at the rate of forty or fifty miles an hour. She was driving fast in order to reach Gurdon before the truck could get to Arkadelphia. Before going for first aid her father went to the [Norris] garage and had the sheriff called. The witness did not see a stick of wood in the road, but "wouldn't say there wasn't any." Miss Chambliss did not get out of the car at the garage. She said: "I didn't know what kind of a truck it was that the stick of wood fell from—it was just a large truck. I wouldn't say [whether] the truck had a tarpaulin on it, or not. The stick of wood did not hurt me. I did not notice my back hurting until the next day or two. I went to see Dr. McClain. He didn't take any X-ray; neither did he plaster my back up in any way, but gave me some liniment to rub on it. I went back to the doctor to see if it would develop into anything else. It did not. My back is better, but I don't do any work. . . . I have seen the Southwestern Transportation Company's truck [parked near the courthouse], and the truck from which the stick fell was a large truck just like that one. I saw the stick come from the top of the truck. The parked truck [near the courthouse] has a cab and a trailer, but I don't remember whether the truck from which the stick fell had a cab and trailer, or not."

Dr. McClain treated L. D. Chambliss' injured eye, and testified: "He didn't tell me what truck the stick flew

from." In mentioning treatment of the eye, after having described a small scar on the cornea, the doctor said: "I have seen him once since [February 12] and noticed his eye was much better, and didn't examine it. Most of what I found [in the way of injuries to Miss Chambliss] were subjective symptoms."

Delbert Taylor, testifying on behalf of appellant, stated he was driver of the brick truck mentioned by witnesses for appellees. He drove up immediately after the accident. Before meeting the [Chambliss] car he passed a man driving a wagon and team (evidently Alvin Francis) "six or seven hundred feet south of the car with the broken windshield. I saw the broken windshield and stopped my truck, and the driver of the wagon and team came up later behind my truck. Mr. Chambliss was standing outside the car and Miss Chambliss was sitting in the car on the opposite side of the wheel. I saw no truck ahead of me nor on the highway, but if one had been there I could have seen it for a mile or more. The road is straight, except that it goes over a little hill there."

The witness further testified: "Two trucks passed me: one while I was in Gurdon and the other just as I came out. The Southwestern Transportation truck passed me right in Gurdon. The other truck was a transport truck that hauls cars. . . . The Southwestern Transportation Company truck was going faster than mine. I had stopped when it passed me. My truck was loaded, and for that reason I had to take my time. . . . The Southwestern Transportation Company truck was fifteen minutes ahead of me and the other truck was behind it. As I came through Gurdon I stopped to let two men get off my truck [who had been picked up at Prescott], and while they were getting out the Southwestern Transportation truck passed me. I was traveling twenty-five miles an hour."

Earl Ross, manager of the Norris Chevrolet Company at Gurdon, testified that Mr. Chambliss drove up with his daughter and told what had happened and asked that the sheriff be called at Arkadelphia "and have him stop the truck that caused the injury. . . . In giving a description of the truck [in order to have the informa-

tion relaid to the sheriff] he said it was a Southern Grocery truck. It had a tarpaulin on it. He couldn't give the color, but thought it was red. I called [Sheriff] Shaw at Arkadelphia and told him [what Chambliss had said]. About thirty minutes later Mr. Carver, a deputy sheriff, called me back and asked me to describe the truck again. I then went to Mr. Chambliss again and asked him about it. He gave the same description he did the first time— that is, that it was a Southern Grocery truck, believed to be red in color. The Southwestern Transportation Company truck was never mentioned by either Mr. Chambliss or Miss Chambliss. . . . Mr. Carver informed me that he stopped a truck, but it did not answer the description, and he would have to turn it loose. When Mr. Carver called me back Mr. Chambliss restated that there was. a tarpaulin on the truck. Mr. Chambliss said he was sure the tarpaulin was on the truck. The only thing he wasn't sure about was that it was a Southern Grocery truck."

Hugh McCarthy, an employee of the Norris Chevrolet Company, supported testimony given by Earl Ross that Mr. Chambliss called at the garage and reported the accident, saying that he did not know what kind of a [truck] it was, but that it did have a tarpaulin on it. . . . The Southwestern Transportation Company was not mentioned by either [of the appellees].

Deputy Sheriff Carver testified that he remembered the telephone call from Gurdon. Witness, with another officer, was instructed by the sheriff to investigate. They were told to look for a Southern Grocery truck, or a Southwestern Grocery truck. They were also informed that the truck had a tarpaulin on it. They found a Southwestern Transportation Company truck and were informed by the driver that he had just arrived. The driver told them he had not seen a truck with a tarpaulin on it. They took the truck number and called Mr. Ross at Gurdon, asking if he were sure the wanted truck had a tarpaulin, and "after he had talked to some one he said to me that it was a truck with a tarpaulin on it. We took the name of the Southwestern Transportation Company's driver and told him that if we needed him we would get in touch with him. He told us about seeing a car with a

windshield knocked out. He said he met the car on his way to Arkadelphia. He told us the man was holding a handkerchief over his face and a lady was driving. I looked over the Southwestern Transportation Company truck and don't know how a stick could stay up there. I don't think it could long at a time. . . . The driver of the Southwestern Transportation Company told us that after he saw the windshield of a car broken, he saw a stick of wood in the road. . . . I saw two trucks on Seventh street with tarpaulins on them. I don't know how they came in. I didn't talk to the drivers of the trucks that had tarpaulins on them. . . . Assuming that a car stopped two or three minutes at the place of the accident, then drove to Gurdon and [the driver] placed a call and the message got to the sheriff's office and we would get down to highway 67, a truck would have had time, running at the rate of forty miles an hour, to have gotten there.''

S. R. Copeland, of the state police force, testified he was in the sheriff's office at Arkadelphia when the call came from Mr. Ross at Gurdon; that he went with Carver to look for the offending truck. ''The instructions we had were that it was a Southern Grocery Company truck with a tarpaulin on it. . . . We saw a Southwestern Transportation Company truck and I called Mr. Carver's attention to it, but it didn't have a tarpaulin on it.''

''Q. Did you make an inspection of the [Southwestern Transportation Company] truck? A. Yes, we looked it over and there were not any signs or any marks on it, and Mr. Carver called back to Gurdon about it.'' [3]

---

[3] The witness Copeland, testifying as to the search in Arkadelphia for the truck described to the sheriff's office, said: "Q. Did you find any trucks over on Seventh street with tarpaulins on them? A. Two of them were in town at that time belonging to one man. They were hauling fruits and vegetables: I know the man, and he hauls fruits and vegetables from South Texas, and all the way up the line. Q. And those trucks had tarpaulins on them? A. Yes, sir, the one that was loaded—the one that came up one street as we were going down another. It had a tarpaulin, but it was nailed down on the end with strips; but the other had been in town some time."

C. T. Kelliher testified regarding the statement Alvin Francis had signed.[4]

D. E. Perry, truck driver for Southwestern Transportation Company, testified that the truck he was driving January 4, 1938, had been inspected in Little Rock about midnight. He drove to Texarkana and unloaded. He left Texarkana about nine o'clock, driving between thirty-five and forty miles an hour. His truck had a "governor" on it that prevented a higher rate of speed than forty miles an hour. His only stop between Texarkana and Little Rock was at Arkadelphia. "Coming [toward Arkadelphia], and coming up an incline around Curtis Junction, I saw [the Chambliss car] meeting me. The windshield was all shattered, and it looked like a hole had been broken in it, but the glass had not fallen out. . . . I saw the broken place in the windshield before I got to the car. . . . In Arkadelphia I noticed a [state police] car coming around from the highway. Mr. Carver got out of the car . . . and told me he wanted to look over my equipment, which he did. He told me to wait a short time, that he wanted to use the telephone. Mr. Carver then came out of the filling station and said, 'This is not the fellow we want.' I told him if he would give me some kind of a lead I might be able to help him. He explained about the piece of wood going through the [Chambliss] windshield, and I knew I met that automobile coming to Arkadelphia, and told him about it. They told me they were looking for a Southern Grocery truck with a tarpaulin on it. There was no occasion for me to carry a stick of wood on the truck. We carry a jack, block, jack-handle, and all the necessary equipment that goes with each piece. The equipment is locked up in a box on the side of the frame. We also carry a tool box in the cab, with the time books and pliers. I would have no occasion for a stick of wood to be put on the top of my truck. If a

---

[4] Kelliher further testified: "I work for the St. Louis Southwestern Railroad and the Southwestern Transportation Company. I took a statement from Mr. Francis and wrote it down as he gave it to me. . . . I didn't put anything in it that he told me not to put in. I didn't know where the accident happened and was trying to find out. The statement was taken after this suit was filed, and the filing of the suit was the first indication I had of the accident."

stick of wood was put there it wouldn't stay on top of the truck by the time I got out of Little Rock. There is nothing to hold a stick of wood on top of the truck. I 'straddled' a piece of wood after I passed this car with the broken windshield. I know there was no stick of wood fell from my car because the windshield was broken before the car ever got to me.''

Since the jury returned verdicts in favor of both appellees, we must look entirely to the testimony given in appellees' behalf in determining whether the verdicts were based upon speculation and conjecture, or upon substantial evidence.

Alvin Francis was the only witness who testified that the situation of appellant's truck was such that an inference might be drawn that the stick of wood fell from it. When his testimony as to the *manner* in which a truck passed him, and as to the *time* it passed, is considered in connection with that of Glea Chambliss—who says she saw the stick fall from the truck that passed Francis— the jury would have been warranted in fixing liability upon the owner or driver of such truck, or both. The difficulty, however, lies in the absence of substantial testimony identifying the offending truck. It is true that Francis, in one phase of his story, says the truck that passed him was a Southwestern Transportation Company truck, but obviously that is a conclusion he drew from observations. Nowhere does he say that the words, ''Southwestern Transportation Company,'' appeared on the truck; nor did he undertake, upon independent information, to say that he recognized the truck as one of appellant's fleet. Evidential value of his testimony is characterized by equivocation more than it is by directness. For example, he asserted that the truck had ''Southwestern'' on its side. ''Q. Is that all it had? A. I don't know; I didn't stop to examine it. Q. What else did it have on it? A. Southwestern Transportation. Q. You are sure of that? A. It had 'Southwestern Transfer Company.' Q. You said awhile ago 'Southwestern Transportation Company,' and now you say, 'Southwestern Transfer Company.' A. It had 'Cotton Belt' on it.''

At another place in his testimony, the witness said (referring to the truck that passed him): "I glanced around at it and saw 'Southwestern' on the side of the trailer."

It is obvious that this witness assumed that the truck was one belonging to Southwestern Transportation Company, but this assumption is based upon what he saw and inferred, for he does not testify that "Southwestern Transportation Company" appeared on the truck or trailer.

Testimony was offered by appellees showing that Perry, the driver, reached Arkadelphia at a period in point of time which would suggest a probability that he passed the Chambliss car as alleged by appellees. This is unimportant. Perry admitted being on the road at a time approximating that of the accident. It is significant, however, that Copeland, the state policeman, testified that he and the deputy sheriff looked Perry's car over, and *"there were not any signs or any marks on it."* This evidence is not disputed other than by the conjecture attaching to the testimony of Alvin Francis and Glea Chambliss. If the truck Perry drove had no signs or marks on it, it could not have been the one Francis says he saw that did have signs and marks on it—markings and signs he described in at least four ways.

Appellee L. D. Chambliss, on cross-examination, declined to say that he did not tell Ross the offending truck had a tarpaulin on it. Nor was Glea Chambliss willing to say the truck in question did not carry a tarpaulin. The testimony of Ross and McCarthy that L. D. Chambliss, in describing the truck to them, stated that it was equipped with a tarpaulin, is undisputed.

Finally, we have this situation: Francis saw a truck pass shortly before he met appellees' car. The truck "whipped around to its side of the road." Francis' method of identifying such truck as being one then operated by Southwestern Transportation Company has been commented upon. Glea Chambliss saw the stick of wood come from the top of the truck thus described as having cut around Francis. She did not identify the truck, nor did her father. Francis stopped his wagon

when he saw appellees had been injured, and from him appellees secured the identifying information. Both appellees then went to Gurdon. The father told Ross their injuries had been occasioned by a Southwestern Transportation Company truck; but his information was from Francis, and Francis did not know. We conclude, therefore, that there was no proper identification of appellant's truck.

The judgments are reversed, and the causes are dismissed.

Mr. Justice HUMPHREYS and Mr. Justice MEHAFFY dissent.