Missouri Pacific Railroad Company, Thompson,
Trustee, *v.* McKamey.

4-7061                                            171 S. W. 2d 932

Opinion delivered May 24, 1943.

908

*Henry Donham* and *Leffel Gentry,* for appellant.

*J. H. Lookadoo* and *Agnes F. Ashby,* for appellee.

KNOX, J.   Appellee brought this suit to recover damages under the Federal Employers' Liability Act, 45 U.S.C.A., § 51, *et seq.,* and all parties agree that his right of recovery is dependent upon this act, and the. applicable decisions with reference to causes arising under it.

The allegations of negligence set forth in the complaint may be summarized as follows: That on June 26, 1941, while appellee was engaged in the service of appellant as a member of a bridge crew in the rebuilding of a bridge at or near Reader, Arkansas, he and other members of the crew were required to use timbers which negligently had been too heavily saturated with a creosote solution of too great strength; that in placing said pieces of timber in their respective positions appellee used a timber bar furnished by appellant for that purpose; that as appellee was endeavoring to place a certain piece of timber into position he stuck the sharpened end of the timber bar into such piece of timber which was overloaded with creosote, and that as he did so. and as a result thereof the creosote splashed into his face and eyes, severely burning and blistering the same, from which he has suffered and will suffer great pain, and has expended and will expend large sums for medical attention; that on account of the injury so received he

has developed optic nerve atrophy, and his vision has been impaired to the point that he now only has a vision of 20/200, which condition will not improve, but will grow worse.

To the complaint appellant filed an answer setting out a general denial of all material allegations of the complaint, and pleading by way of affirmative defenses contributory negligence, and assumed risk.

A trial resulted in a verdict and judgment for appellee, and appellant urges only the following grounds for reversal: (1) that the trial court erred in refusing appellant's requested instruction No. 1, which was a peremptory instruction to find for appellant, and (2) that the verdict of the jury is excessive.

In the trial court appellant urged four grounds in support of its request for a peremptory instruction: (a) that the evidence failed to show that appellant was guilty of any negligence which caused or contributed to appellee's injury; (b) that the injury, if any, was solely the result of appellee's own negligence; (c) that appellee had assumed the risk, and (d) that there was not sufficient evidence to justify the finding that the atrophy of appellee's optic nerve (assuming such condition exists) resulted from the alleged splashing of the creosote in. his face and eyes, even if such happening did in fact occur.

On February 1, 1943, approximately five months after the trial of this cause, the Supreme Court of the United States delivered an opinion in the case of *Tillar* v. *Atlantic Coast Line Railroad Company*, 318 U. S. 54, 87 L. Ed., *............, 63 Sup. Ct. Rep. 444, in which opinion Mr. Justice BLACK, speaking for the court, says: "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law (Federal Employers' Liability Act) by the 1939 amendment."

Appellant concedes that its plea of assumption of risk is foreclosed by that decision, and it does not here urge that as a ground for reversal.

In the course of the argument of this cause it was suggested that the effect of that decision is to increase

---

* Paging not available at time of going to press.

responsibility of carriers so as to hold them liable for injuries resulting from the ordinary risks incident to the operation of railroads even where such risks could not be eliminated by the exercise of ordinary care.

Footnote 30 to that opinion contains this statement: "It appears to be the clear congressional intent, that to the maximum extent proper, questions in actions arising under the act should be left to the jury."

Since we have reached the conclusion that the facts of this case required the submission of the question of negligence to the jury, under general rules announced by our own, as well as, decisions of the federal courts, it is not necessary for us to ascertain whether the decision in *Tillar* v. *Atlantic Coast Line R. Co., supra,* prescribed for cases arising under the Federal Employers' Liability Act rules by which to determine negligence, or rules governing the submission of such questions to the jury, which are materially different from rules governing those matters in other actions of tort.

Rules governing the matter of granting or denying motions for directed verdicts have been often declared in decisions of this court. The field is so broad that it is impossible to encompass within a single statement all of the rules with respect thereto. That portion of the rules applicable to the facts here, however, may be summarized as follows:

In reviewing the action of a trial court denying a motion for a directed verdict this court on appeal considers only such of the evidence as is favorable to the party against whom such motion was directed, and disregards all evidence favorable to the party who made such motion. The highest probative value must be accorded such evidence, as well as all reasonable inferences which may be properly deducible therefrom; and when so examined, if such evidence together with the inferences deducible therefrom, is found to be substantial in character, and of such nature that if standing alone, undisputed and unimpeached it would have been sufficient to support the verdict, then such motion was properly denied. *Missouri Pacific R. Co.* v. *Hampton,* 195 Ark.

335, 112 S. W. 2d 428; *Southwestern Transportation Co.* v. *Chambliss,* 197 Ark. 865, 125 S. W. 2d 123; *Missouri Pacific Transportation Co.* v. *Sacker,* 200 Ark. 92, 138 S. W. 2d 371; *Harmon* v. *Ward,* 202 Ark. 54, 149 S. W. 2d 575; *St. Paul Fire & Marine Ins. Co.* v. *Martin,* 204 Ark. XVIII, 165 S. W. 2d 606.

Appellant does not deny, in fact experts on the subject testifying for appellant admit, that creosote, where no attempt has been made to purify it, contains such elements as phenol or carbolic acid which are poisonous to the skin and blood stream. Appellant insist, however, that there is no evidence in this record to support the allegation that these timbers were treated with unpurified creosote; on the contrary, it contends that the undisputed testimony shows that the timbers were treated with "creosote oil," which experts testify is the "dead oil" which remains after the poisonous substances have been removed from the basic creosote by a process of distillation and neutralization.

Experts testified that the amount of phenol and other poisonous substances remaining after the distillation and neutralization process depends upon variable factors, particularly the extent to which such process is carried, but for the most part one per cent. or less is the general average.

Witnesses testified that the "creosote oil" used in treating timbers for appellant was purchased in carload lots, on specifications furnished by it, and that samples from each car were sent to a consulting engineer on timber and wood preservatives. The timbers used in this bridge were treated June 13, 1941, the consulting engineer testified that the samples taken from the carload lots and sent to him between June 1 and June 15 met the specification. He had previously testified that creosote oil meeting such specifications would have in it not more than one per cent. of phenol.

There is evidence in the record that a solution which contains not more than one per cent. of phenol would not be injurious. In fact the evidence is to the effect that a weak solution of such character could be used with

safety as an antiseptic. There was, however, evidence which was sufficient to justify the jury in finding that the timbers used in the construction of this bridge were treated with creosote oil containing a much greater per cent. of phenol. Roy Wilson, foreman of the bridge crew constructing this bridge, testified: that the pilings furnished to be used in this construction apparently had been treated in .the same way as the timbers on which appellee was working at the time of his injury; that a few days before appellee was injured he, the witness, and others of his crew were engaged in driving the pilings; that these pilings were being set in the stream spanned by the bridge; that he and other members of the crew in the performance of such work were required to stand in the water where the pilings were being set, and that the creosote solution came off of and out of the pilings and mixed with the water; that the resultant mixture of water and creosote became strong enough to, and that it did in fact, blister witness and other members of the crew from their waists down.

There was also evidence of a substantial character sufficient to justify the finding of the jury that the timbers had been too heavily saturated with the creosote solution and improperly dried, as alleged in the complaint.

Appellee testified that the timbers were not properly treated and not properly dried. I. J. Yocum testified that the timbers were unusually heavily treated with creosote. The foreman, Roy Wilson, testified that the wood was full of it, that the timbers were dripping with the solution, that all of the men were talking about it, and that after appellee was injured the men working under the bridge used mud in an effort to cover the wood in order to prevent the fluid from dripping on them from such timber.

Appellee's statement that when he stuck the pointed end of the bar into the stringer a substantial quantity of the fluid flew out and sprayed over his face, getting into his eyes, etc., is corroborated by Wilson, M. L. Lambert and other members of the crew.

H. H. Wright, bridge and building supervisor for appellant, a man with 33 years' experience, with 150 men,

comprising seven crews, including the crew in which appellee was employed, being under his direction and control, testified that in order for any appreciable amount of fluid to fly out of a piece of timber on being struck with the pointed end of a bar it would have to be soggy and wet with creosote. He further testified: "Q. If it were properly treated and properly dried even a teaspoonful wouldn't come out? A. No, sir. Q. A half a teaspoonful wouldn't? A. It would be a very small amount. Q. It would be just a spray? A. A small amount might come out. I don't know whether it would spray up or sideways."

"Q. Mr. McKamey testified that when he stuck the sharp instrument into the timber a considerable amount come up and struck him around his eyes—he estimated a fifth of a teacup full—enough to run off his face, would you expect that much creosote to come out of properly treated timber? A. No, sir. Q. And if it was properly treated it wouldn't come out? A. No, sir."

Appellant, on the other hand, introduced testimony to the effect that all of these timbers had been treated at a Little Rock plant, in a proper manner, by means of a modern scientific process, in accordance with correct and proper specifications. It introduced the records of such treating plant, and men employed in such plant testified with respect to such records, and also with respect to the treatment of the timbers used in the construction of this particular bridge. Such records and testimony were to the effect that the solution injected into these timbers was "creosote oil" which had been rendered harmless by removal from the basic creosote phenol and other poisonous substances, and further that only the proper, and not an excessive amount of the solution had been injected into the timbers, and that thereafter such timbers had been properly dried by means of a suction drier, which had been installed and was being operated in accordance with accepted scientific principles.

The situation here presented is somewhat analogous to the situation presented by the facts in several deci-

sions of this court, commonly referred to as the "Coca-Cola cases." In those cases we held that where there was evidence that a foreign substance was found in a bottle of Coca-Cola and there was also proof that the bottles were cleaned by means of the most modern scientific process, which it was claimed, insured that no such substance could get into or remain in such bottles, the question of negligence was nevertheless one for the jury. *Coca-Cola Co.* v. *McBride,* 180 Ark. 193, 20 S. W. 2d 862; *Coca-Cola Co.* v. *Massey,* 193 Ark. 423, 100 S. W. 2d 681; *Coca-Cola Co.* v. *Bell,* 194 Ark. 671, 109 S. W. 2d 115.

So here, where on the one hand we have evidence relative to the condition of the timbers at the time they were being installed in the bridge, which evidence was sufficient to support an inference that such timbers negligently had been too heavily saturated with a too strong solution, and thereafter improperly dried, and on the other hand we have evidence that such timbers were in fact treated and dried in a proper manner by means of a modern scientific process, it is for the jury to determine the question.

What has been said, necessarily also, disposes of appellant's contention that appellee's injury, if any, was due solely to his own negligence. There is in the record, however, ample evidence to support a finding that appellee was guilty of contributory negligence. Under the Federal Employers' Liability Act contributory negligence does not bar recovery, but does mitigate the amount recoverable. In the Tillar case, Mr. Justice BLACK, pointed out that the report of the Judiciary Committee on the bill, which became the 1939 amendment, revealed that such bill, "was clearly aimed at making the principles of comparative negligence the guiding rules of decisions in accident cases." As evidence thereof the learned justice quotes from the report as follows: "The adoption of this proposed amendment will, in cases in which no recovery is now allowed, establish the principle of comparative negligence, which permits the jury to weigh the fault of the injured employee and compare it with the negligence of the employer, and, in the light of the comparison, do justice to all concerned."

Appellant contends that the evidence is not sufficient to establish a causal connection between the malady from which appellee is now suffering and the injury received by him—in other words, the evidence is not sufficient to establish that the atrophy of the optic nerve resulted from the creosote solution splashing on his face and in his eyes, as claimed by him.

Dr. E. H. McKay of Texarkana and Dr. Z. H. Short of Hot Springs, both practicing physicians specializing in diseases of the eye, ear, nose and throat, testified on behalf of appellee. The record of their testimony covers thirty-eight pages of typewritten matter. Each of these doctors testified that in their opinion appellee was suffering from atrophy of the optic nerve or retrobulbar neuritis caused, in their opinion, by the burn received from the creosote solution splashing in appellee's face. Testimony of doctors called by appellant is to the effect that only a burn of sufficient severity to cause a toxic condition which would be absorbed into the blood stream could have caused such condition—these doctors testified that in order to attribute the present condition of appellee's optic nerve to the splashing of the creosote solution in his face it would be necessary to first show that he received therefrom a second or third degree burn. Such a burn would have left scar tissue, and appellee's face, eyeballs and eyelids give evidence of no such condition. Dr. Short admitted that the burn would have to cause a toxic condition, but he stated that there are records of cases where superficial burns have caused optic atrophy. Dr. McKay testified that a toxic condition could be set up by a first degree burn, especially so where the burn was produced by creosote which itself contains toxins which have a definite affinity to the nerve fibers.

Dr. McKay in his testimony referred to the work of a recognized medical authority which listed in great detail under five headings the factors which medical science recognizes as causes for optic neuritis. He then testified that by a series of examinations, carried on over a period of several weeks, he had been able to eliminate, to his own satisfaction, all of these known causes, except

the one of a toxic condition resulting from a burn; and that by this process of elimination he reached the conclusion that appellee's condition was the result of his having had the creosote solution splashed in his face. It is true that at places in his testimony he used such expressions as that such "was a probable cause," or "in my opinion it probably" caused it. At other places in his testimony, however, he definitely stated "I believe from my examinations" that appellee's condition is due to his getting the creosote in his eyes "that is the conclusion I came to."

Dr. Short fully corroborated Dr. McKay. It is true that in answer to a question as to whether in his opinion appellee's condition was the result of his having gotten the solution on his face and in his eyes, he answered "It could have been." Later, however, he positively testified that in his opinion appellee's condition was the result of the creosote getting into and around the eyes, and that he came to that opinion by the process of elimination, in the same manner as described by Dr. McKay.

It was within the exclusive province of the jury, in passing upon the weight which should be given the testimony of these doctors, to determine what effect, if any, these seeming uncertainties of opinion should have upon the probative value of the whole of their testimony. The jury apparently regarded these matters only as examples of that conservatism of expression often encountered in statements made by men of science.

In the case of *Malvern Lumber Co.* v. *Sweeney,* 116 Ark. 56, 172 S. W. 821, and again in the case of *Mo. Pac. R. Co.* v. *Simmons,* 190 Ark. 876, 81 S. W. 2d 924, we quoted from 3 Bailey on Personal Injuries, p. 2136, as follows: "It may be correctly stated as a rule that proof of an alleged act or omission as causing injury is not sufficient to establish it as the cause, so long as other causes exist and were present, which might as well have caused it. Surmise and conjecture cannot supersede proof. There must exist some degree of certainty. There need not be absolute certainty or freedom from reasonable doubt, but sufficient must be shown to overcome or more

than balance any presumption that other causes may have produced it.''

We are of the opinion, however, that the testimony here offered to establish the causal connection between appellee's injury and his present physical condition is more than surmise and conjecture, and was sufficient to justify the jury in finding that appellee's impaired physical condition resulted from the injury he received.

Appellee at the time of his injury was fifty years of age with an expectancy of 20.2 years. He was earning $145.80 per month. At the time of the trial his vision was 20/200, which doctors testified rendered him incapable of performing any kind of work for which he was fitted —that such condition was permanent and would grow worse. The evidence that he has or will in the future suffer great pain is slight, likewise the evidence does not show that he has been, or in the future will be, required to make substantial expenditures for medical care and attention. A very large proportion of the damages awarded therefore must rest upon the loss of earnings. The jury returned a verdict for twenty thousand dollars, which is approximately the present worth of the total sum which appellee would have earned if he had not been injured and had lived throughout all the years of his expectancy, and had been constantly employed during all of such time, at a wage equal to that he was receiving at the time of his injury.

In the case of *Missouri & North Arkansas Railroad Co.* v. *Robinson,* 188 Ark. 334, 65 S. W. 2d 546, the late Mr. Justice BUTLER, speaking for the court, said: ''Ordinary experience and knowledge of human affairs show that, when one has reached the age of the deceased, his opportunities and powers for earning rapidly lessen, and, although Cunningham's life expectancy was thirteen years, it is wholly irrational to believe that during these years he would have earned a wage equal to that of his vigorous manhood.''

In the case of *Mo. Pac. Railroad Co.* v. *Haigler,* 203 Ark. 804, 158 S. W. 2d 703, a case arising under the Federal Employers' Liability Act, this court reduced an

award made by the jury because the jury apparently had not taken into consideration the contributory negligence of the employee.

A majority of the court have reached the conclusion that in this case the verdict of the jury is excessive in the amount of ten thousand dollars. Ordinarily it is not necessary to determine the causes which prompt a jury to return an excessive verdict, and doubtless in many cases it would be impossible to do so. In this case, however, it would appear that the jury failed to take into consideration the fact that appellee's earning capacity would decrease with the passing of time, and also that it failed to give proper consideration to the matter of appellee's contributory negligence.

In order to cure the error, however, it will not be necessary to reverse the judgment, provided appellee enters a remitturer for the excess. If within fifteen days appellee enters a remitturer in the amount of ten thousand dollars the judgment will be affirmed, otherwise it will be reversed and the cause remanded for a new trial.

It is so ordered.