MISSOURI PACIFIC TRANSPORTATION COMPANY v. SIMON.

4-5620 135 S. W. 2d 336

Opinion delivered November 27, 1939.

*R. S. Wilson, Buzbee, Harrison, Buzbee & Wright, Caudle & White,* for appellants.

*J. E. Yates, Bob Bailey, Partain & Agee* and *Hall & Hall,* for appellees.

GRIFFIN SMITH, C. J. Because a bus operated by Missouri Pacific Transportation Company was rendered immobile when a drive shaft broke, the agent in charge chartered taxicabs at Clarksville to carry passengers to Russellville. In one of the conveyances so engaged were Mrs. Fannie Pat Simon, Mrs. Etta Erwin, Mrs. W. M. Adcock and C. G. Bell. This cab collided in Russellville with an automobile driven by Mrs. John Leonard, one of the appellants herein.

PAGE 290]

There were jury verdicts and judgments as follows: Mrs. Erwin and Mrs. Adcock, $25,000 each; Bell, $6,000; Mrs. Simon, $1,250; W. M. Adcock (for expenses and loss of his wife's companionship), $1,000.

The question of negligence has been concluded by the jury's verdict, although reasonable minds might sharply differ with that determination. There was substantial evidence in support of the contention that Mrs. Leonard was at fault, although testimony opposing this allegation is likewise substantial. In these circumstances it was for the jury to decide. No serious objections are urged to the instructions, to admissibility of evidence, or to conduct of the trial.

The principal relief asked by appellants—in fact, the only tenable ground of attack—is that the evidence does not support verdicts amounting in the aggregate to $58,250. We have concluded that the two smaller judgments, one for $1,250 in favor of Mrs. Simon, and one for $1,000 in favor of W. M. Adcock, may be affirmed, and it is so ordered.

The situation is different in respect of the other three judgments.

*Mrs. W. M. Adcock.*—Mrs. Adcock, recipient of a verdict and judgment for $25,000, was in the hospital at Russellville 26 days, attended by Dr. Roy I. Millard. She testified: "I was hurt down here (indicating). From here to here (indicating) hurt, and I was bruised all the way up. My chest was hurt and through here (indicating) and under the shoulders and the back of my neck and head felt all battered up, but it cleared away; but it was after so long—about 20 days before it quit hurting."

The following examination of Mrs. Adcock is of importance:

"Q. Where all do you suffer, and how do you suffer at this time from the injuries you received? A. My knee was hurt and it is weak and if I get it bent back, you see. When I wake up at night it is agony to straighten out. Q. What about the scars? A. I don't know what the doctor will call it. When I was hurt it was black on the

left hip down to below the knee. The veins are still black. The black places, they cleared away. I still have pains in my chest and neck and head—all the time. I don't hear as well as before. About an hour after I got in the hospital I couldn't hear hardly anything. I asked a nurse what was the matter, and she said, 'O, I guess it was that shot.' I had never taken [a hypodermic injection] that did me that way, but [the deafness] never cleared away. It is better, but not as good as it was. I am bothered about going to sleep and wake up too early. I don't like [to take sleeping potions] for fear of forming a habit.''

On page 17 of appellees' brief the following appears in connection with the examination of Mrs. Adcock:

''Q. Did you [prior to the collision] have any kind of physical disability that you know about? A. I may have had some, but I was doing fine.'' Mrs. Adcock's counsel then asked: ''Were you suffering any way from a disability of any kind?'' There was a negative answer.

Mrs. Adcock, 58 years of age, is the wife of a minister. Her duties were such as are ordinarily discharged by a minister's wife. This question was asked by her counsel: ''Have you been able to discharge those things, carry on church work and household duties since [the injuries were inflicted?''] Her answer was: ''Yes, sir.'' Pursuing the investigation on this phase of disability, counsel then asked: ''You say you have been: you mean all the time since November 1?'' The answer was: ''No, sir: I haven't done anything but walk around in the sun a little since. Before the collision I didn't have any hired hand and did all the work. Since being injured I have not been at church. I invited the women to bring the missionary society to the home; then I didn't sleep until after three o'clock in the morning, and decided I would not do any more of that 'till I got well.''

Further describing her disability, Mrs. Adcock said: ''My back, that hurts sometimes bad and sometimes not so bad. Sometimes I wake up of a morning and if I move my head off the pillow sharp pains hit me. I have to stay in bed all day, you know. Sometimes in the day it will clear up. . . . I can get up and go do something—

look out and see my chickens—then I have to go back and lie on the bed or in a reclining chair. That will rest it then. If I get up—if I stay up long—then I have to rest a long time. Then I take spells every once in a while. I can't move any way—just such agonizing pains I can't move any way on the pillow. The doctor gives me 'pain dine,' or something of that kind. That condition has existed until now [but] is getting better."

Dr. J. L. Post, of Van Buren, testifying at the instance of plaintiffs, had examined Mrs. Adcock, but did not treat her. Her history disclosed an old operation; that she had borne four children; weighed 155 pounds. His opinion was that the patient had only a hazy recollection of the collision.—"She gives a history of headache of the occipital region—the region back of the head—which is very constant and distressing; complains of pressure in the head with pain in the scalp and back of neck. She also complains of dizziness, insomnia, photophobia, noises in ears, nausea, and vomiting; loss of appetite, inability to work. She does have lucid moments. . . . I find pain on pressure over the region of the left shoulder with a rupture of the pleural sac above the left clavicle or collar bone. I find evidences of injury to the left knee. . . . I find that she is confused and flighty, with memory defects, which are permanent. She is suffering a traumatic encephalitis, which may be for weeks, or months, or years. She is very emotional, with intellectual disturbances and memory defects which remain as results. She laughs at things that should be serious. . . . She has a contusion or infection of the whole part of the brain. Encephalitis of the brain is inflammation of the brain substance itself. . . . She may go on for several years in this same condition, but she will gradually get worse and finally die. There is no chance for improvement in the future."

Dr. Millard testified that "outside of the nervous condition there wasn't anything that would indicate Mrs. Adcock would not completely recover at the time she left the hospital in Russellville."

Dr. S. C. Fulmer, of Little Rock, examined Mrs. Adcock February 17, 1939—three and a half months after the injuries were inflicted. (Trial was March 27, 1939). The question was: "Dr. Fulmer, Mrs. Adcock claims now that she is suffering from a continual nervous condition that at times is irregular; [that] she had a cloudy condition of the mind and is unable to remember things. Do you find from your examination anything which would indicate (if such is the present condition) [that] it would be a result of an injury sustained by her in this accident?" The answer was that he did not.

Dr. Millard testified that Mrs. Adcock, when brought to the hospital, was apparently suffering more than the others. She complained of an injury to her back. An X-ray was negative in this respect. She also complained of her left shoulder. Later Dr. Millard said: "Mrs. Adcock was suffering from slight shock and soreness in both elbows and the right ankle."

A hypothetical question was addressed to Dr. Millard. It assumed that since being injured Mrs. Adcock had been unable to do her housework; that she was nervous and forgetful, and had not been in that condition prior to the injuries; that "she can't remember things at all and when serious things are brought up or asked about, she laughs silly and says something important, and is nervous all the time." The doctor was asked to leave out of consideration personal knowledge acquired as a result of his examinations of and attentions to Mrs. Adcock; to assume that the information requested was applicable to a person in Mrs. Adcock's situation—to one in mental and physical conditions similar to those attributes as they applied to Mrs. Adcock prior to the collision—and to state whether, in his opinion, the type of injury or injuries sustained "would cause that sort of condition to happen." There was an affirmative answer.

Dr. Post testified largely from objective symptoms and from a history of the case supplied him by the patient and others. The doctor gave it as his opinion that Mrs. Adcock had suffered a fracture to the petrous pyramid or arch under the brain. This conclusion, like others,

was based entirely upon symptoms and the history. The history included Mrs. Adcock's description of blood draining into the throat. Dr. Post conceded there was no way of ascertaining whether the blood was from the interior of the nose or from the back part of the nasal cavity. There was no attempt to confirm the objective symptoms or to connect them with the history through use of the X-ray.

We take judicial notice of the fact that in most cases where bones have been broken or fractured, roentgenology is highly effective as a means of ascertaining the true condition, although it is not an infallible science because of the fallibility of human agencies which must interpret results.

Mrs. Adcock's medical and hospital bills were $237.50. In 1920 she spent two weeks in a Russellville hospital receiving treatment for a fibriod tumor. Later, the tumor was removed in Memphis by operation. She had undergone an appendectomy. Her tonsils, embedded, were removed in 1926. The question was asked: "How long prior to the accident had it been since you were treated by a physician? A. I don't remember right now. I know the thing I have been treated for since I was in the hospital for an operation. I have habitual, chronic sick headaches." She ascribed the headaches to gastric acidity.

The award of $1,000 in favor of W. M. Adcock was to compensate loss, past and prospective, of his wife's companionship and services, and for medical expenses and hospitalization incurred to the date of the trial, and to be incurred in the future. It is significant that, although $5,000 was asked in the complaint for these elements of damage, the jury saw fit to reduce the demand by four-fifths. It may well be assumed that the jury did not believe the husband would long be denied the normal companionship of his wife, nor that other expenses of inordinate proportions would arise in consequence of Mrs. Adcock's condition. The finding that the injured party should be paid $25,000 was to compensate pain and suffering and the slight loss of earning power as disclosed

by the record. The two findings are so obviously inconsistent that we must determine, as a matter of law, whether the evidence sustained the verdict for so large an amount as that recovered by Mrs. Adcock. Her life expectancy was 15.39 years.

In determining whether a judgment is, or is not, excessive, this court is faced with many difficulties. The record is presented to us in cold type, unless there is oral argument. The jury has advantages we do not possess in that it sees and hears the witnesses, studies their demeanor, their expressions, and measures the degree of interest they may (as is the case at time) have in the subject-matter of litigation, and in the outcome. The mere fact that a judgment seems large does not, alone, warrant its reduction. There must be other considerations. But, as was said by Chief Justice ENGLISH in an opinion of the court written more than fifty years ago (*Little Rock and Fort Smith Railway Company* v. *Barker and Wife,* 39 Ark. 491) ". . . a jury is not left without restraint in the matter of assessing damages . . . in any . . . case. If the damages assessed are so enormous as to shock the sense of justice, and to indicate that the verdict is the result of passion or prejudice, the trial court may set it aside, and if he refuse, this court, on appeal or writ of error, may do so."

In *Interurban Railway Company* v. *Trainer,* 150 Ark. 19, 233 S. W. 816, (opinion by Mr. Justice WOOD) the court held that it "could find no basis in reason" to sustain a judgment for $5,000. There is this expression: "The judgment, therefore, will be modified by deducting therefrom $2,500. As thus modified, it is affirmed."

Under similar authority this court, in an opinion written by Mr. Justice HART (*The Railway Ice Company* v. *Howell,* 117 Ark. 198, 174 S. W. 241), modified a judgment of $14,355.75 rendered on a jury's verdict compensating a widow for the death of her husband. The language used in that case was: "Therefore, the judgment will be remitted down to $12,000, and for that amount it will be affirmed."

In *Temple Cotton Oil Company* v. *Holliday,* 185 Ark. 1190, 47 S. W. 2d 4, judgment on a verdict for $23,000 for the death of a foreman who suffered from a mangled arm was affirmed. On rehearing (March 14, 1932) it was reduced to $12,500 for the widow and kin and $5,000 for the estate.

A judgment for $15,000 against Temple Cotton Oil Company in favor of the plaintiff Brown (192 Ark. 877, 96 S. W. 2d 401) was reduced to $7,500. Brown, an employee, sued for personal injuries.

The facts in *St. Louis, I. M. & S. Ry. Co.* v. *Hesterly,* 98 Ark. 240, 135 S. W. 874, were that the decedent's legs were both mashed off to the knees by being run over by a train. He was treated by a physician for an hour and a half and lived for five hours thereafter, suffering great pain part of the time. He also suffered great mental anguish in contemplation of death and continually begged that prayers be offered in his behalf. This court held that judgment on a verdict for $10,000 for pain and mental anguish was excessive, requiring reversal unless reduced by one-half. The Arkansas decision was reversed in 1913, 228 U. S. 702, 33 S. Ct. 703, 57 L. Ed. 1031.

In respect of an award of $7,500 to compensate damages for death, the deceased having been 29 years of age when killed and having an expectancy of 35 years (the pecuniary loss being $540 per year), it was held that the judgment should be reduced to $5,692.68.—*St. Louis, I. M. & S. Ry. Co.* v. *Robbins,* 57 Ark. 377, 21 S. W. 886.

No rule has been established—and in the nature of things none can be—for determining what compensation should be paid for loss of life, for pain and suffering, for loss or decrease of earning power, for mental anguish accompanied by physical injury, for loss of companionship, and for the various elements entering into damage actions.

The late Mr. Justice BUTLER, in *Missouri & North Arkansas Railroad Company* v. *Robinson,* 188 Ark. 334, 65 S. W. 2d 546, reasoned for the court as follows: "So far as we have been able to ascertain from the record

before us it is uncertain how frequently Cunningham [a brakeman who lingered two hours before dying of injuries received when he fell from a moving train and the wheels of the tender and engine passed across his legs, severing them, one above and one below the knee] worked, or for what length of time over any given period. Therefore, any verdict based on this ground must be wholly conjectural and speculative. Ordinary experience and knowledge of human affairs show that, when one has reached the age of the deceased, his opportunities and powers for earning rapidly lessen, and, although Cunningham's life expectancy was 13 years, it is wholly irrational to believe that during these years he would have earned a wage equal to that of his vigorous manhood.'' The verdict was for $5,000 for physical pain and mental anguish for benefit of the estate, and $10,000 as pecuniary loss to the widow. In reducing the judgment Judge BUTLER said:

''We are of the opinion, therefore, that the amount of the verdict, in any view of the evidence, would not be justified for a sum greater than $2,500. Accordingly, the judgment for the benefit of the widow will be reduced to that sum, and judgment entered here therefor. In all other respects the judgment is correct, and it is affirmed.''

The other extreme is shown in *Missouri Pacific Railroad Company* v. *Bushey*, 180 Ark. 19, 20 S. W. 2d 614, and in *Southwestern Bell Telephone Company* v. *Balesh*, 189 Ark. 1085, 76 S. W. 2d 291. In the Bushey Case $48,500 for the death of a 53-year-old locomotive engineer was held not excessive, while in the Balesh Case $50,000 to the widow and children of a 51-year-old man was upheld.

In reading our own cases, many of which are not cited in this opinion (and a number of which might be shown as authority either for or against reducing judgments), the conclusion is inescapable that factors other than mere physical or mental injuries and loss of earning capacity and the elements usually enumerated are taken into consideration where the facts as set out in the opinions are seemingly similar. Otherwise, such divergent views would not have been expressed.

We approach the subject reluctantly because of a double responsibility: first, the responsibility of modifying a jury's verdict; and, second, that of substituting our own judgment for the judgment of the triers of facts and of dispensing justice within the law in so doing.

However, when our views are firmly fixed in respect of a miscalculation by jurors, or of a mistake that has been made through sympathy, prejudice, or partiality, and the record sustains our conclusions that the extrinsic elements or considerations referred to have entered into the result, it then becomes our solemn duty either to reverse and remand for another trial, or to give judgment here for a sum we think justified, and to eliminate any excess that is not sustained by substantial evidence.

The rule is stated in Corpus Juris Secundum, v. 5, § 1650, as follows: ''A finding of value or the amount of damages is so much a matter within the exclusive province of the jury that it will ordinarily not be disturbed by the reviewing court where the issue has been fairly submitted under proper instructions, unless palpably without support in the evidence presented at the trial, unless the jury have departed for the same reason from the legal measure of damages, or unless the verdict is so palpably excessive or grossly inadequate as to indicate bias, passion, prejudice, corruption, outside influence, or mistake, or shock the conscience or sense of justice, or unless manifest error therein otherwise appears. . . . However, (p. 646) it has been held that an appellate court may or must interfere if the verdict is not reasonably within the range of the evidence, or where there has been an abuse of discretion, or if it appears to be the result of passion and prejudice. . . . Since the duty of guarding against excessive verdicts (§ 1651 a) rests to a great extent on the trial judge, who will presumably not allow excessive verdicts to stand, the authority vested in appellate courts to disturb the verdict of the jury on the ground of excessive damages is one which should be exercised with great caution and discretion. . . .

''Notwithstanding the general rule heretofore stated (§ 1651 b), reviewing courts generally have power to set

aside verdicts because excessive, and that too, although the trial court has refused to set aside the verdict where it is clear that the latter court has abused the discretion vested in it. A verdict will be set aside by an appellate court as excessive where there is no evidence on which the amount allowed could properly have been awarded; where the verdict must of necessity be for a smaller sum than that awarded; where the testimony most favorable to the successful party will not sustain the inference of fact on which the damages are estimated; where the amount awarded is so excessive as to lead to the conclusion that the verdict was the result of passion, prejudice, or corruption or other misconduct, or of some error or mistake of principle, or to warrant conclusion that the jury were not governed by the evidence. . . ."

As to Mrs. Adcock's injuries and their consequences, the most favorable testimony in her behalf is that given by Dr. Post, who admittedly had not been her physician, and who, presumably, was employed by the plaintiff to make an examination. His statements are inconsistent with this appellee's own testimony. It must be inferred that she appeared as a witness during a lucid interval, even if we should say (which we do not) that the evidence is sufficient to warrant the jury in finding that her memory had been disturbed.

In any view that may be taken in respect of all of the evidence—from which the term "substantial" must be drawn—it is not sufficient to warrant a judgment of $25,000. Necessary factors of computation were not taken into consideration by the jury. For example, a present payment of $25,000 compounded annually at 6 per cent. interest is worth $61,315.93 at the expiration of 15.39 years—Mrs. Adcock's life expectancy.

We have concluded that $15,000 is the most the evidence will warrant. This sum, if paid presently and put at interest during the period in question, (in the manner mentioned in the preceding paragraph) would produce $36,789.56.

*Mrs. Etta Erwin.*—Mrs. Erwin, a resident of Florida, was awarded $25,000. She had been a teacher of home

economics in high school and junior high school. The left side of her mouth was paralyzed by the injury. She testified: "My glasses were broken all to pieces; my eyes were black and closed for almost a week. I received the 'lick' on the right side of my head, up in my hair. There was a lump, and all across my nose was bruised. This bridge across here (indicating) was jammed, and there was a bruise up here (indicating) until my temple was as big as a goose egg."

Mrs. Erwin further testified that she was unable to read until she got her glasses; that her physician advised that she refrain from reading too much, and—"I can't read but a little while at a time because my eye feels like it is going to pop out, and they have to keep a pad on this eye" (indicating).

She was hit behind the ear—"my left ear across that mastoid bone, and my ear has never stopped hurting me since—only when I take something—and that only eases it for a little while. My ribs were bruised and top of that breast back over here and on the right arm and shoulder; and on the left arm and shoulder all over there. There are two big marks across there half way between my elbow, and there were some ridges across there, and I knew they were broken. For two months I could hardly raise my arm at all." "Q. Do you use your hand now? A. It hurts me all through the shoulder and back here."

Continuing, the witness described what she termed an injury to her right breast and under her shoulder blades. She was unable to raise her head for several weeks.—"I was on my back and had to breathe through my mouth and pains would hit me in the head, and I had to take medicine to rest; and I had my left hip bruised. I am bruised all on the back and on the side of the hip, and here about this muscle." Other injuries of like nature were described.

Mrs. Erwin insisted that she could not remember anything; that she would put her glasses down, and couldn't find them; also, that she couldn't get around "much, either."

She complained of a growth in her breast, noticed for the first time the last of November or the first of December.

Dr. Post examined Mrs. Erwin the day preceding trial of the suit. After describing the injuries as recounted to him by the patient and mentioning evidences still observable, he said: "I found a lump or enlargement in the right breast which she said was not there before the accident. There is no pain in this enlargement and there are no enlarged lymphatic glands in the axilla or any of the surrounding tissues. . . . This enlargement is a benign tumor of a lobe of the milk gland, which may in time become malignant. . . . She has given birth to five children. . . . She is very pale, which would indicate an anemic condition."

The doctor gave it as his professional judgment that the breast ailment was not cancerous; that it could be removed by an operation, but thought the patient would not be helped by such removal ". . . because of the mental condition: she has been told about the cancer so long that she thinks she has a cancer. She has a cancer complex."

Dr. Millard testified: "As for any fracture or anything of that kind, she didn't have any. From the history, our findings or diagnosis follows: Slight percussion, slight acute brain injury, and slight hemotonia beneath the left eye and left side of face. Severe contusions of the head, arms, forearms, abdomen, left thigh, knee, and leg. She has apparently recovered from physical ailments except that she still does limp and complains of soreness. We have observed her when she didn't know we were noticing, and she still limps. However, we are unable to find any evidence of any injury to the bones or joints. She has high blood pressure. There does seem to be considerable damage to the nervous system from which she has not recovered so far; and if she will, I am unable to say."

Mrs. Erwin was 61 years old, with a life expectancy of 13.47. She had not been engaged as a teacher since 1936, but prior to that time she had earned $110 per month. Medical and hospital charges were $736.

Our view is that judgment for more than $10,000 would be excessive. The amount awarded ($25,000) at six per cent. compounded annually for 13.47 years would produce $54,826.92. Ten thousand dollars similarly used would yield $21,930.77.

*C. G. Bell.*—This plaintiff, a farmer, was 72 years of age. His life expectancy was 7.55. The judgment of $6,000 was to compensate for ribs alleged to have been broken. He claimed to have been unconscious in the hospital for a week following the collision. In addition, he said: "I hurt right down the left hip and back, and right on down this leg to my knee." After the injuries he was unable to stoop and pick up objects from the floor or ground. Has had difficulty in hearing—"I can't hear; I don't know what's going on here today. . . . I can't sleep nights—I can't lie on that side." Developed pneumonia after the collision and nearly died. Has headaches and ringing in the ear—"My head rings all the time and hurts."

Dr. A. W. Rye testified he thought the shock to Mr. Bell caused dementia praecox. The same physician admitted he had not made a diagnosis in respect of the disease mentioned, but ". . . that is my judgment, my conviction."

Dr. Millard testified that while Mr. Bell was in the hospital he had a deep bronchitis and was very sick. The symptoms were such that the patient was first treated for pneumonia.

Dr. Fulmer testified regarding Mr. Bell's injuries and his condition February 9, 1939, as follows: "His appearance is that of an elderly man with stooped shoulders and showing the appearances of senility. His face is ruddy. The right eyeground shows some sclerosis with a few white patches in the retina. All his teeth are dirty, worn down, and some of them show pus at the gum margins. The throat is negative—no goiter. The chest is emphysematous (barrel-shaped). There is a fatty tumor the size of a small goose egg on his left shoulder. Heart enlarged, rate 96; extra systoles; first sound forceful but roughened; aortic second sound accentuated. There

is a systolic murmur at the apex. Examination of lungs shows scattered moist rales throughout both sides, more at the base, posteriorly. The right side of his chest, posteriorly, is more prominent than the left." The remainder of the diagnosis is shown in the margin.[1]

The judgment of $6,000 in favor of appellee Bell, computed as a present payment and valued as heretofore set out in respect of the other awards, would yield $9,319.50 in 7.55 years. Three thousand dollars would produce $4,659.75.

We think the evidence, analyzed in the manner required to give legal effect to the verdicts, does not justify a recovery of more than $3,000.

The judgment for Mrs. Adcock is reduced to $15,000. That for Mrs. Erwin is reduced to $10,000. The Bell judgment is reduced to $3,000. As so reduced, the judgments are affirmed.

HUMPHREYS and MEHAFFY, JJ., dissent as to the reductions.

HUMPHREYS, J. (dissenting). A statement of this case sufficiently appears in the majority opinion relative to the negligent acts of appellants resulting in the injuries received in the collision by Mrs. Etta Erwin, Mrs. W. M. Adcock, and C. G. Bell and others occupying the taxicab used by appellant, Missouri Pacific Transportation Company, in transporting its passengers into Russellville. Without going into the details as to the manner in which

---

[1] "He complains of severe pain in the region of the left nipple on pressure. This is true only when he has his attention focused on the spot. Pressure here when he is not noticing it does not elicit evidence of pain. There is no deformity in the region complained of. Nothing was made out in the abdomen, except a relaxed condition of the muscles. He has a small, incomplete inguinal hernia, left, which he has had for some years, and which is well supported by a truss. All of the arteries in the extremities are pulsating, but he has coarse tremor in his extended fingers not unlike a mild palsy. There is slight edema of both legs over the shin bone. There is no objective evidence of injury or disease in the region of the left hip, where he says the pain is. Lymph glands are not enlarged, but his nerve reflexes are hyperactive, and urinalysis was negative. The rectal examination shows the prostate to be moderately enlarged. During the examination I purposely put an object on the floor for him to stoop over to get. He did this without any evidence of pain in his back. Ears: he can hear moderately loud conversation well. Diagnosis: first, high blood pressure; second, hypertensive heart disease; third, hardening of the arteries, due to high blood pressure; and fourth, hypertrophied prostate."

the appellees were injured it is sufficient to say that these passengers received their injuries without any fault on their part through the admitted negligence of the Missouri Pacific Transportation Company. In other words, the Missouri Pacific Transportation Company admits liability to these passengers for the injuries they received, but contend that the verdicts returned in favor of Mrs. Etta Erwin, Mrs. W. M. Adcock and C. G. Bell are excessive. Verdicts for $25,000 each were returned in favor of Mrs. Etta Erwin and Mrs. W. M. Adcock, and in favor of C. G. Bell for $6,000.

The issues as to the extent of the injury each received and the amount that each should recover were submitted to the jury under correct instructions as to the extent of the injuries and measure of the damages. The jury made its verdicts after they saw the witnesses; heard them testify; observed their demeanor on the witness stand. The jury also had an opportunity to see the several injured parties and to hear them testify. The Supreme Court has had no opportunity to hear, observe and see the witnesses nor to hear and see the appellees themselves and, hence, are not as well qualified as jurors to pass upon the extent of the injury that each received and the amount each should recover. Growing out of this difference in opportunity to pass upon these issues the law is well settled in this state that verdicts of juries will not and should not be disturbed by the courts which are supported by some substantial evidence or unless there is something in the record to indicate passion or prejudice on the part of the jury in rendering the verdicts. *Kelly* v. *McDonald*, 39 Ark. 387; *Texas and St. Louis Ry. Co.* v. *Eddy*, 42 Ark. 527. It can not be said in the instant case that the amounts of these verdicts are not supported by substantial evidence.

Mrs. Adcock was the wife of a Methodist minister and had been actively engaged in church work and in the performance of her household duties for a number of years. She was in good health prior to November 1, 1938, but since receiving the very painful and serious injuries received by her in the collision, she has been unable to do any church work or carry on her work as a Sunday school

teacher or to do her house work. She has been, as it were, a nervous wreck, her memory practically gone and when anyone propounds to her serious questions she replies with a silly laugh which is very embarrassing to her husband and friends. As a result of the accident all the joy of life has been destroyed as far as she is concerned. I think $25,000 is small remuneration for the permanent injuries received by her and continual suffering which she must endure and the deprivation of all joy resulting from congenial service in life such as church and Sunday school work and housekeeping.

The record reflects that Mrs. Erwin received painful and severe injuries from which she suffered excruciating pain which left her in a highly nervous condition. She received a slight but acute brain injury. In fact appellant's physician admits that there was considerable damage to her nervous system from which she has not recovered and from which she perhaps will never recover. The injury left her with a limp that she did not have before. Mrs. Erwin was a school teacher, age 61, at the time of the accident and when teaching she had received $110 per month. She was forced to give up teaching three or four years prior to her husband's death in order to nurse him. He had been afflicted with a second stroke of paralysis. There is no question in the record that, so far as future service is concerned, Mrs. Erwin is out of the picture and must content herself with doing nothing for the rest of her life except suffer and endure pain inflicted upon her without any fault on her part. The jury was warranted in rendering a verdict in her behalf for $25,000.

C. G. Bell was awarded $6,000. It is true he was 72 years of age, but, according to the undisputed proof, he was a strong, healthy and vigorous farmer at the time he was injured. He was struck on the head in the collision and rendered unconscious. He had some ribs broken. He could hear well before the injury, but after the injury and when he was in the court room in the trial of this cause, he testified that he could not understand what was being said. He also testified that he could not sleep at night whereas before the injury he could and also

testified that he had a ringing in his ears all the time whereas his head prior to that time was clear of ringing noises. He also testified that he was given to headaches very frequently after the injury whereas before the injury he never had any headaches. As a result of the injury he had very severe bronchial trouble which some of them concluded was pneumonia and he frequently spit up blood. He also testified that he suffers a great deal.

I think this is a very clear invasion of the exclusive province of the jury by the court, and the invasion of the rights of the jury to reduce these verdicts is contrary to the law and is not justified by the facts in the record. If, in the face of a record like this, courts can invade the provinces of a jury and reduce their verdicts the jury system should be abolished and the constitutional rights of jurors to determine questions of fact lodged by amendment to the Constitution in the judicial department of the state. I am forced to differ from the majority of my associates in the reduction of these judgments and Mr. Justice Mehaffy joins me in this dissent.