STRAHAN *v.* WEBB.

5-1969                                          330 S. W. 2d 291

Opinion delivered December 21, 1959.

*A. James Linder, Barber, Henry, Thurman & Mc-Caskill,* for appellant.

*Switzer & Switzer, Jones, Blackwell, Chambliss & Hobbs,* West Monroe, La., for appellee.

CARLETON HARRIS, Chief Justice. On November 5, 1957, William Warren Webb, age 47, a salesman for the Louisiana Paper Company, out of the Monroe office, was instantly killed in a collision with a truck belonging to the Kaminer Construction Company, a Georgia corporation, and being operated by their employee, Clarence E. Strahan, who, at the time, was acting within the scope of his employment. There was evidence that Strahan was drinking at the time of the collision. Webb was survived by his wife, Marteal B. Webb, and two sons, Frederick Ross Webb, age 18, and Garland Warren Webb, age 17. Suit was instituted by Mrs. Webb individually, and as next friend of the two minor sons, seeking total judgment in the amount of $320,000. On trial, the jury returned a verdict for Mrs. Webb against both defendants in the sum of $115,000 and returned verdicts for the benefit of the sons in the amount of $25,000 each, or a total verdict of $165,000. Judgment was entered in accordance therewith, and from such judgment comes this appeal.

Appellants contend: First, "The trial court erred in overruling defendants' Motion to Set Aside the Verdict of the Jury and the Judgment Rendered Thereon." Second: "The Verdicts of the Jury Were Excessive."

## I.

On December 13, 1958, appellants filed a "Motion to Set Aside the Verdict of the Jury and the Judgment Rendered Thereon" on grounds that;

"(1) Since the trial, defendants have discovered new evidence which could not be brought to the Court's attention before the filing of this motion.

(2) That a certain juror or jurors, serving on the jury, on *voir dire* failed to disclose alleged information which they apparently had obtained and which, if disclosed, would have disqualified them from serving in the trial of this case. Such information was imparted to the entire jury during its deliberations, and that it was false and untrue and calculated only to cause passion and prejudice in the minds of the jury.

(3) That such improper and extraneous matter was considered by the jury to the prejudice of the defendants."

Attached to the motion were the affidavits of six of the jurors who served, the affidavits being identical in form and content as follows:

"STATE OF ARKANSAS
COUNTY OF ASHLEY

### AFFIDAVIT

I, the undersigned, hereby state that I was a member of the Jury Panel that tried the case of *Webb* v. *Strahan & Kaminer Construction Company,* in the Ashley County Circuit Court on November 20, 1958, and November 21, 1958. That during the jury deliberation of the case by the Jury, the Jury was advised, and information reached the Jury that the Insurance Company of Defendants had offered to pay the sum of $120,000.00 as a compromise settlement of the case.

Witness my hand this 12th day of Dec., 1958."

This motion was overruled by the trial court. Of course, these affidavits do not state that affiants, or any other member of the jury, based their vote on the information received; there is no statement that the amount awarded resulted from this occurrence, nor that except for this incident, the verdict would have been smaller. But

it is not necessary that we consider the sufficiency of the affidavits, for though these affidavits contained all of the statements which are omitted, appellants' argument would still be of no avail. Appellants, in their brief, state:

"Not only was the statement made by the juror false, and not only was it no part of the evidence in the case, but if such testimony had been offered in the trial of the case it would not have been admissible because, (a) it would have been telling the jury the defendants were protected by insurance and (b) testimony re an offer of settlement is not admissible."

We, of course, agree, and have held numerous times, that to unnecessarily bring to the attention of a jury that insurance is involved is reversible error; likewise, an offer of settlement is not admissible as evidence of liability. These holdings are so well established as to require no citation of authority. But on the other hand, we have also held that testimony or affidavits of members of the jury cannot be used to impeach their verdict. This holding, based on statute,[1] has been reiterated many times, commencing with the case of *Pleasant* v. *Heard,* 15 Ark. 403. In *Burns* v. *Vaughan,* 216 Ark. 128, 224 S. W. 2d 365 an action was instituted for crop damage allegedly caused by a negligent spraying of the crops. A certificate of the weather bureau showing the direction of the wind on the day of the spraying, which had been excluded by the court, reached the jury by mistake. On appeal, this fact, *inter alia,* was urged as grounds for reversal. In holding this point to be without merit, this Court said:

In any event, however, the only proof that the jury saw the certificate is in the form of affidavits by several jurors. Of course, this is not a permissible method of impeaching the verdict."

[1] The present statute is 43-2204, Ark. Stats. (1947) Anno., and reads as follows: "A juror can not be examined to established a ground for a new trial, except it be to establish, as a ground for a new trial, that the verdict was made by lot." This identical statute is found in the Code of 1869, and has been in effect since that time.

In *Post* v. *State,* 182 Ark. 66, 30 S. W. 2d 838:

"Appellant contends that the judgment should be reversed because the verdict was not unanimous and presents to the court the affidavit of jurors. Section 3220 of C. & M. Digest is as follows: 'A juror cannot be examined to establish a ground for a new trial, except it be to establish, as a ground for a new trial, that the verdict was made by lot.' The affidavits do not tend to establish that the verdict was made by lot, but are for an entirely different purpose."

See also *Wallace* v. *State,* 180 Ark. 627, 22 S. W. 2d 395. The general rule is based upon the logic set forth in 53 American Jurisprudence, Section 1105, page 769:

"The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterward. It is to prevent overzealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of an oath.

Testimony of the jurors to impeach their own verdict is excluded not because it is irrelevant to the matter in issue, but because experience has shown that it is more likely to prevent than to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman. The rule that a verdict cannot be impeached by the testimony of a juror is generally adhered to where it is sought to impeach a verdict on grounds of

misconduct on the part of the juror or his fellow jurors, despite apprehension expressed in many cases that such rule sometimes serves the cause of injustice."

Appellants state that they do not make use of the affidavits to prove "how they arrived at their verdict", but solely to prove misconduct on the part of a juror. This seems to be a matter of "coming in the back door instead of the front", and it will be noted that the last line of the citation just quoted is contrary to appellants' view. In *Capps* v. *State,* 109 Ark. 193, 159 S. W. 193, prejudicial newspaper articles (not a mere narration of the evidence connected with the trial) were read by members of the jury. This Court reversed the trial court because of misconduct of the jury, but *the case was not reversed upon the testimony of the foreman of the jury who testified at the hearing held on the motion for a new trial.* From the opinion:

"The newspaper articles complained of were published in the Fort Smith Times-Record, and the Southwest American, daily papers published in that city, and each was shown to have had a large circulation. The foreman of the jury testified upon the hearing of the motion for a new trial that he and other jurors read these articles. But this evidence was not competent for that purpose and would be insufficient to support a finding that members of the jury had read these articles, because jurors are not thus allowed to impeach their verdict. Section 2423 of Kirby's Digest; *Wilder* v. *State,* 29 Ark. 293. *Smith* v. *State,* 59 Ark. 132, *Hampton* v. *State,* 67 Ark. 266. But the finding that the papers had been read by the jury *did not depend alone upon the affidavit of the jurors,*[2] as the officer in charge of the jury and the proprietor of the hotel at which the jury was being entertained testified that the jurors bought these papers and some of the jurors read them, and that other jurors had access to the daily papers belonging to the hotel and read them as other guests did."

---

[2] Emphasis supplied.

Appellants also argue that the statute, heretofore quoted, is not applicable because no motion for new trial was filed, but only a motion to set aside the verdict of the jury and the judgment thereon. Certainly, logic dictates the view that the legislature, in enacting the statute, did so for reasons of public policy, akin to that set forth in American Jurisprudence, heretofore quoted, and the phrase in the statute[3] "establish a ground for a new trial" was only included because our procedure at that time required a motion for new trial as a prerequisite to an appeal. Under present procedure, a motion for new trial in civil cases is not necessary.[4] Appellants' contention is thus held to be without merit.

## II.

This is a more difficult question. The judgment before us is the largest to come before this Court, and we are confronted with the question of determining whether the amounts recovered can be justified by the evidence. It is stipulated that deceased was 47 years of age, and that his life expectancy at the time of death was 23.08 years under the American Experience Mortality Table. Webb was earning $5,000 a year at the time of his death, and according to his widow, contributed $4,000 of that amount to her and the children. Mr. Sam Orchard, manager of the Louisiana Paper Company branch at Monroe, testified that Webb had been employed by the paper company since 1943, and was the top salesman. His income for the past five years had averaged $5,000 per year, but Mr. Orchard testified that the company had planned to change the method of compensation for salesmen commencing the first of January, 1958, and based on past performance, Webb would have thereafter made somewhere between $7,000 and $10,000 a year. He testified that the company was grooming Webb to succeed him (Orchard) as manager; that the company had no retirement system, and age had no effect on an employee keeping his job. Mrs. Webb, at the time of the trial of this case, was 38 years of age, and had been married to Mr. Webb since 1938. She

---

[3] Section 43-2204.
[4] See Act 555 of 1953.

testified that Mr. Webb had been a salesman-truck driver for Swift in West Monroe, and that they later moved to Shreveport and lived there about a year and a half, later moving back to West Monroe where Mr. Webb secured the job with the paper company. Mrs. Webb holds a master's degree from Louisiana State University and was in her ninth year of teaching in West Monroe at the time of the trial. Her average yearly earnings were $4,300. Her testimony reveals an amicable and happy relationship with her husband and family. It appears that they operated as a "family group" in work and play. They attended ball games together . . . he put up a basketball goal so the boys would have some place to practice . . . they did all of their work at home and Mr. Webb would wash dishes . . . wax floors . . . work in the yard, and bring in the clothes when Mrs. Webb was teaching . . . He had fixed breakfast for 15 years, and sometimes would fix evening meals . . . the family took a yearly fishing trip and went hunting together . . . she suffered terrible mental anguish upon the death of her husband. Mr. Webb had been a most considerate husband, always remembering birthdays, *etc.* . . . she couldn't sleep for months, and when she did sleep, dreamed about her dead husband.

Mr. Webb devoted considerable time to his children, and the older boy, Frederick Ross, age 18 at the time of his father's death, testified that his father belonged to the West Monroe Quarterback Club, attended football practice, and after practice would discuss football tactics with the son (Frederick was captain of the team during his senior year). Frederick testified that he discussed personal problems with his father, and that his father had talked with him about the future, and about the career he would follow for life — namely law. Frederick was a freshman at LSU at the time Mr. Webb was killed. Garland was 17 at the time of his father's death, and was a senior at West Monroe High School. At the time of the trial, he was attending Northeast Louisiana State College, located in Monroe, where he was studying dentistry. He likewise testified as to his

father's interest in his school, and extra-curricular activities. He stated that he and his father played baseball together many times, and the deceased started him playing baseball in the Little League. Testimony reflected that his dentistry course would require seven years, and Garland desired to go to Loyola in New Orleans to finish the course.

While we have here a picture of happy, congenial family life, we cannot say that the family relationship was any different from the average American family. Most devoted husbands are willing to help their wives in household tasks, remember birthdays and other anniversaries, and turn over the bulk of their income for family maintenance. The average father is certainly interested in the welfare of his children, and their activities. It would be a rare parent indeed, particularly if athletically minded himself, who would not become quite enthusiastic when his son was captain of the football team. While we certainly would not minimize the devotion which Mr. Webb apparently held for his wife and children, we only point out that his actions were but the actions of an average ''good'' husband and father.

After careful consideration, we have reached the conclusion that the verdicts are excessive. To demonstrate this statement, we point out that this award of $165,000 could be safely invested in any number of securities that would pay 5% interest. 5% interest on this amount of money would enable appellees to receive an annual income of $8,250, which would be $4,250 per year more than the family had received at any time from the deceased ($4,000 was the highest figure given by Mrs. Webb), — *and the principal would remain intact.* We think it obvious that such a result clearly shows the verdict to have been excessive. We first consider the award for the benefit of the boys. The court instructed the jury that, as regarded the minors, ''* * * your verdict should be for such sum of money as you believe from the evidence would be just and fair compensation for all the pecuniary damages suffered by each of said minors during their respective minorities by reason of

the death of the said William Warren Webb, and in arriving at this sum you may take into consideration such care, support and sustenance and such advantages and benefits in the way of training and education, both moral and intellectual, if any, as you may believe from the evidence that they would each have received from or through their father if his death had not occurred." It will be noted that "mental anguish" is not included. The proof reflected that Frederick is studying law, and will be in school for total of seven years. His mother testified that the first year cost $1,200; she estimated the second year would be $1,500, and the balance would be somewhat higher. "Of course, as he advances and enters law school, his expenses are going to be higher, more expensive." Frederick had already left home, and the value of the father's moral and intellectual training would not be so great as would that of a father to a child of tender years, and living at home. In fact, both boys' habits, outlook, and moral code had, in the main, been molded and established before the death of Mr. Webb. Frederick had already decided to become a lawyer, and the matter of the future had apparently been discussed with Garland. Garland lacked nearly four years attaining his majority at the time his father was killed. The evidence reflected that Garland's expenses at Northeast College were $700 per year, and his mother testified that, from her investigation, the cost at Loyola would be around $3,000 per year. Appellant argues that the amount of recovery to the boys is limited to damages suffered during their respective minorities, and the court so instructed the jury. To these instructions, appellee objected **and noted** her exceptions. We do not agree that the recovery is limited to damages suffered during minority.

In *Missouri Pacific Railroad Company, Thompson, Trustee* v. *Gilbert, Administrator,* 206 Ark. 683, 178 S. W. 2d 73, this Court said:

"Recovery for benefit of children *ordinarily*[5] should be limited to the present worth of such sum as would be contributed by the parent prior to their majority."

---

[5] Emphasis supplied.

In *Kansas City Southern Railway Company* v. *Frost,* 93 Ark. 183, 124 S. W. 748, this Court said:

"The right of the children to recover beyond minority depends upon evidence. Their damages are the pecuniary loss suffered by them, which is 'the probable aggregate amount of his contributions to them, reduced to present value.' *Kansas City Southern Ry. Co.* v. *Henrie,* 87 Ark. 454. It is probable the contributions of a father to the support of a child after he reaches his majority may cease altogether, or be less. That, of course, will depend upon the ability of the child to take care of himself and his success in life. Parental affection for the child will not, probably, cease after minority, and the father may still continue to contribute to the support of the child. That is a question for the jury to decide according to the evidence of the assurance the parental affection may give of aid and support to the child after minority."

See also *Jenkins, Administrator* v. *Midland Valley Railroad Company,* 134 Ark. 1, 203 S. W. 1.

The rule varies from state to state in permitting recovery for pecuniary loss, arising from the wrongful death of a parent, by a child who has reached his or her majority. Of course, damages for pecuniary loss are confined to the period of minority, where the statute so provides. There is nothing in our statute, § 27-909 (Act 255 of 1957), which so limits recovery. We are of the opinion, which is in line with the previous decisions heretofore cited, that the right to recover damages for pecuniary loss beyond the minority of the beneficiaries, depends upon the circumstances. Here, the proof is clear, that in the natural course of events, the deceased would have contributed, to the best of his ability, to the education of the two boys, and we accordingly take the view that even though they would attain their majority before finishing college, still the boys suffered a pecuniary loss (beyond the age of their minority) for which damages will lie. The question is therefore what amount will adequately compensate the sons for the loss suffered.

Under prior decisions of this Court, the awards to all appellees must be reduced. The case bearing the nearest resemblance to the instant litigation from a factual standpoint is *Southern National Insurance Co.* v. *Williams,* 224 Ark. 938, 277 S. W. 2d 487. This opinion was delivered on April 4, 1955. There, Ruben C. Knabe was killed in an automobile collision. At the time of his death, Knabe was 35 years of age, had a life expectancy of 33.44 years, and was earning about $8,000 a year, of which "well over half" was contributed to the support of his family. Knabe had three small children. The jury awarded $5,000 for the benefit of the estate and $95,000 for the benefit of the decedent's widow and children. On appeal, this Court said:

"Since his conscious pain was compensated by the $5,000 verdict, the question is whether $95,000 is too liberal an allowance for the pecuniary loss sustained by his family. Precedents are of scant value in a case like this, but it may be observed that this verdict exceeds any ever upheld by this court. In *Mo. Pac. R. Co.* v. *Bushey,* 180 Ark. 19, 20 S. W. 2d 614, the Court approved a verdict of $48,500 for the death of a father who was contributing $3,260 annually to his family, but the award included an undetermined amount for intense suffering. And in *Southwestern Bell Tel. Co.* v. *Balesh,* 189 Ark. 1085, 76 S. W. 2d 291, we sustained a $50,000 award for the death of one who was contributing $7,000 a year to his wife and children. At the other extreme, comparatively small verdicts have not infrequently been reduced; many of the cases were reviewed in *Mo.-Pac. Transportation Co.* v. *Simon,* 199 Ark. 289, 135 S. W. 2d 336. After considering this case in the light of its predecessors, and taking into account the increased cost of living, we are of the opinion that the sum of $75,-000 is the most liberal allowance that can be justified by the record." It will be noted that Knabe had a greater life expectancy, contributed as much to the family support, *and had three small children.*

The testimony relative to Frederick's education denotes $1,200 spent for the first year, $1,500 to be spent

for the second, with no figure being given for the five years' balance. If we average Frederick's legal education at $1,700 per year for 6.8 years, we find that the total expenditure for his education is $11,560.00, the present value of which is an approximate $9,592.00.[6] As to Garland,[7] the evidence reflects that the cost of his education will average $1,685 per annum ($700 for four years, and $3,000 for three years), or a total of $11,-795.00, the present value of which is approximately $9,-749.00. As pointed out, each boy had already received, in large measure, the benefits to be derived from the moral and intellectual training contributed by the father. Since the pecuniary loss is so nearly the same, we are of the opinion that a total award to each son in the amount of $12,500 would be adequate. This means each will receive between $2,500 and $3,000 for loss of instruction, moral and intellectual training, and this award, we feel, must be limited to the period of minority.

Turning now to the award for Mrs. Webb: She testified that the deceased had been contributing $4,-000 per year for the support of the family. It is obvious, when considering that the college education for the boys would average approximately $3,385 per year, that Mrs. Webb, for the next seven years, would only have received $615 per year of the total amount. Following that period, we will assume that she would have received the entire $4,000. In such event, for the period of 23.08 years (Mr. Webb's life expectancy), appellee would have received $69,220.00, the present value of which is $40,527.24. However, the proof reflected that a new plan of compensation was to go into effect January 1, 1958, under which, according to Sam Orchard, the manager of the Louisiana Paper Company, Mr. Webb would have earned from $7,000 to $10,000 per year. Splitting the amount, thus taking a figure of $8,500, and after

---

[6] This figure, as well as all figures hereafter given, is arrived at on the basis of 5% interest.

[7] Of course, Garland will be in school one year after Frederick finishes, but this does not substantially affect the figures herein.

deducting income tax[8] and $1,000 for Mr. Webb's personal expenditures (clothing and other personal items), Mrs. Webb would have received $18,865.00 for seven years, and $91,977.60 for the balance of 16.08 years, or a total of $110,842.60. The present value of this sum is approximately $64,896.72. This means that $45,945.88 is the interest Mrs. Webb will receive over 23.08 years. On this amount, taking the lowest rate, Mrs. Webb would pay approximately $5,500 in income tax, the present value of which is $3,217.46. The figure is based on the premise that Mrs. Webb has no other source of income, but if she continues to work, earning at least the present amount, $4,300 per year, this tax would be great deal higher.

It would seem apparent from the compilations herein given, that under our prior holdings, a substantial reduction of the judgment is not only demanded, but is further entirely justified from the evidence in this case. It is sometimes most difficult to determine how a jury arrived at its verdict, particularly where an award of money is given. *It is apparent in the instant case that the jury took the figure of Mr. Webb's salary ($5,000 per year), and multiplied that salary by his life expectancy (an approximate 23 years), and reached the amount awarded,* $115,000. Of course, under the court's instructions, this manner of figuring was erroneous, for they were told that damages should be based "* * * on the present value of the amount that you find from a preponderance of the evidence deceased would have contributed to the support and well-being of his wife during his lifetime." Actual pecuniary loss can be fairly well figured in dollars and cents, being in the nature of a property loss, and of course, property values can be definitely established, but we are prone to state that determination of an award for mental anguish suffered, and loss of consortium, is somewhat in the nature of speculation. Who can say how much mental anguish is

---

[8] Mrs. Webb was self-employed; allowing Mr. Webb three dependents (self and two boys) for the entire period of the boys' college education, and then one dependent (himself) for the balance of the 16.08 years, his income tax for seven years would amount to approximately $1,420, and for the balance of 16.08 years, $1,780.

worth? Who really can ascertain how much the loss of a husband or wife has affected the remaining spouse? We daresay that no happily married husband or wife would sell that happiness for any amount of judgment that would be awarded. Unquestionably, the anguish and total loss of companionship will be felt far more in some cases than in others. There are individuals who really never completely reconcile themselves to the loss of a loved one, while, on the other hand, there are those who adjust themselves within a reasonable period of time, and are pretty well able to continue along in the usual pattern. Of course, the attitude of the deceased spouse toward the survivor would influence that feeling. Here, the uncontroverted proof shows that Mr. Webb's attitude toward Mrs. Webb during life was such as to bring to her extreme sorrow and grief upon his passing.

In most of our cases, the Court has simply stated that the sum awarded is excessive by a particular amount, and reduced the judgment accordingly. Here, we have endeavored to show by an analysis made in a logical and proper manner, the amount of award that would properly compensate appellee, and at the same time, give to appellants the justice to which they are entitled.

As previously stated, the present value of the amount of money Mrs. Webb could expect to draw for 23.08 years, if her husband had lived, is $64,896.72. Adding to this the present value of the income tax she would pay on the interest over the total period of time, we find that the total present value of future contributions will approach $68,000. Taking into consideration, in addition to pecuniary loss, mental anguish and loss of companionship and consortium, we are of the view that a total award to Mrs. Webb of $98,000 is proper in this case.

We therefore are of the opinion that the judgments in favor of Frederick and Garland should be reduced from $25,000 each to $12,500 each, and the judgment in favor of Mrs. Webb from $115,000 to $98,000.

The judgments are affirmed on the condition that remittiturs are entered as indicated within 17 calendar days; otherwise the judgments will be reversed and the cause remanded for a new trial.

McFADDIN and JOHNSON, JJ., dissent.

ED F. McFADDIN, Associate Justice, dissenting. I dissent as to the remittitur. The jury awarded the widow $115,000.00 and awarded each of the two sons $25,000.00. The majority opinion says that these verdicts, totalling $165,000.00, are "the largest to come before this Court"; and then seeks to justify the reduction of the verdicts. Finally, the majority reduces Mrs. Webb's verdict from $115,000.00 to $98,000.00, and reduces the verdict of each of the boys from $25,000.00 to $12,500.00; thus saving the appellants $42,000.00 and reducing the total verdict from $165,000.00 to $123,000.00.

I commend the majority in attempting to explain why these reductions were made. Certainly, when a jury brings in a verdict and the Supreme Court decides to reduce it, the Supreme Court should explain how and why it is making the resolution[1], rather than merely contenting itself with picking a figure out of the air. But, even so, I cannot escape the feeling that in this case the majority is "second-guessing" the jury and really sitting as an appellate jury; and such is not the function of the Supreme Court.

At the outset, there is the matter of Mr. Webb's earning capacity. He had been earning $5,000.00 a year, using $1,000.00 for his own personal items, and contributing $4,000.00 a year to his family. Mr. Webb's employer testified that Webb was to receive a promotion and would receive from $7,000.00 to $10,000.00 per year beginning immediately. It is the duty of this Court to give the evidence its strongest probative force to sustain the jury verdict; and if we give the testimony of Mr. Webb's employer its strongest probative force, then Mr. Webb would receive $10,000.00 a year, would retain $1,000.00 a year for

[1] I dissented as to the remittitur in *Southern National Ins. Co. v. Williams*, 224 Ark. 938, 277 S. W. 2d 487.

himself, and would contribute $9,000.00 per year *in money* to his wife and family. It was stipulated that Mr. Webb had a life expectancy of 23.08 years. If Mr. Webb had lived out his expectancy and had contributed $9,000.00 a year to his family, he would have made a total contribution in excess of $207,000.00 to his wife and family.

Now, what is the *present cash value* of $9,000.00 a year for 23.08 years? Insurance tables tell us that for a person to receive $1.00 a year for 23 years would require $14.875 to be invested at 4% *compound interest*. In other words, if a person put up today $14.875 and invested it at *compound interest at 4%* (and that is more than banks are now paying)[2], the result would be a payment of $1.00 a year for 23 years. Since Mr. Webb would have paid $9,000.00 a year for 23 years, the present cash value of Mr. Webb's earnings is just a few dollars less than $134,000.00. So just on a cold dollars and cents basis, Mr. Webb had a present cash value to his wife and children of $134,000.00, and that is entirely ignoring the great intangible value of a "Dad" to the boys and a companion to the wife, and is ignoring also the long dreary years for this family without a father and a husband.

But back to the cold cash dollars and cents value of $134,000.00: how can the majority square that with the figure of $123,000.00 to which it is now reducing the verdict? And that $123,000.00 takes into consideration $30,-000.00 that is allowed Mrs. Webb for mental anguish, because the majority uses this language in next to the last paragraph: " . . . . we find that the total present value of future contributions will approach $68,000. Taking into consideration, in addition to pecuniary loss, mental anguish and loss of companionship and consortium, we are of the view that a total award to Mrs. Webb of $98,000. is proper in this case." So, even by the majority opinion, this $30,000.00 (the difference between the $68,000.00 and the $98,000.00 in the quotation) for loss of companionship, and for consortium and mental anguish, should be added to

---

[2] The majority opinion mentions "5% interest"; but since neither savings banks nor Government bonds paid such interest rate *when the verdict was rendered,* I submit 4% interest is a more realistic figure in support of the verdict.

the $134,000.00 (the cold cash value of Mr. Webb, as previously explained) ; and the result is $164,000.00, which is just $1,000.00 less than the jury verdict. How can the majority "second-guess" a jury when it is clearly demonstrable that the verdict is within $1,000.00 of figures as above explained?

There is another thing about this majority opinion that alarms me; and that is the statement previously quoted: "....we find that the total present value of future contributions will approach $68,000. Taking into consideration, in addition to pecuniary loss, mental anguish and loss of companionship and consortium, we are of the view that a total award to Mrs. Webb of $98,000 is proper in this case." The full significance of that statement is astounding: it clearly seems to imply that as a matter of law the *total of mental anguish damage, loss of companionship damage, and consortium damage,* cannot exceed $30,000.00 in this case; and if such is the rule of law in this case, then such is the rule in every other case. The Legislature has placed no such limitations on those elements of damage. As a matter of fact, a recent Act of the Legislature[3] allowed consortium damage and placed no such limits; and yet this Court, by the present majority opinion, is in effect placing a limit of $30,000.00 on the total damages for mental anguish, loss of companionship and consortium, that a wife can recover for the death of her husband. Our Constitution says that a person is entitled to a trial by jury in a case like this one ; and we have held that a jury verdict will not be disturbed unless it is so grossly excessive as to shock the conscience. It shocks my conscience to see the quoted statement in the majority opinion.

Now, as to the boys: who can measure the damage that these two young boys have sustained in the loss of their father at the very trying years when boys need a father most? How can the majority of this Court say that $12,500.00 is the limit for each boy, when fathers have for years contributed to sons up to half of the estate of the father? The story of the Prodigal Son in Holy Writ is one such example.

---

[3] See Act No. 255 of 1957, as contained in § 27-909 Ark. Stats.

Finally, I revert to the statement in the majority opinion first quoted herein, that these verdicts totalling $165,000.00 are "the largest to come before this Court". That is really, I think, the reason the reductions are being made. Present day verdicts should not be tested by the amounts allowed in the "horse-and-buggy" days since, now, the value of the dollar has depreciated. Courts in other judisdictions[4] sustain large verdicts. The test is whether the evidence justifies the amounts awarded; and I have undertaken to show that the evidence in this case does justify the verdicts rendered. Therefore, I dissent as to the remittitur: and Justice JOHNSON joins in this dissent.

[4] For a few recent cases allowing judgments in death cases, such as this one, see: *Devito* v. *United Airlines*, 98 Fed. Supp. 88, wherein the amount was $160,000.00; *Byrne* v. *Penn. R.R.Co.*, 169 Fed. Supp. 655, wherein the amount was $250,000.00; *O'Toole* v. *United States*, 242 Fed. 2d 308 3rd Circuit, whtrein the amount was $400,000.00; *M.S.F.&G. Co.* v. *Hotkins*, 170 N.Y.S. 2d 441, wherein the amount was $200,000.00; *Tampa Drug Co.* v. *Wait* (Fla.), 103 So. 2d 603, wherein the amount was $160,000.00; *Pennell* v. *B.&O.R.R.* (Ill.), 142 N. E. 2d 497, wherein the amount was $150,000.00; *Buck* v. *Hill* (Calif.), 263 Pac. 2d 643, wherein the amount was $150,000.00; and *Gardner* v. *IIII Corp.*, 135 N. E. 2d 55, wherein the amount was $150,000.00.